Susan McMAHON,

        Plaintiff,

    v.

The MEDICAL PROTECTIVE CO.,

        Defendant.

Civil Action No. 13-911

## MEMORADUM OPINION

Conti, Chief Judge

## I.    Introduction

The dispute in this case arises out of an insurer's negotiation of settlement of a third-party claim against its insured. Defendant The Medical Protective Company ("Medical Protective") issued a dental malpractice insurance policy to plaintiff Susan McMahon ("McMahon"). A third party sued McMahon for malpractice and McMahon and Medical Protective settled that malpractice lawsuit. Under the settlement agreement, McMahon paid $50,000 of her own money in addition to the money paid by Medical Protective. McMahon filed this lawsuit against Medical Protective to recover the funds she paid and other damages. McMahon asserts that Medical Protective breached the terms of the insurance contract and acted in bad faith under 42 Pa. Cons. Stat. § 8371.[1] Medical Protective asserts that under a policy exclusion, the money contributed by McMahon was voluntary and at her own

---

1    The complaint asserted a third count for breach of fiduciary duty, which the court dismissed because a breach of fiduciary duty claim is subsumed by the statutory bad faith claim. *Heffran v. State Auto Prop. & Cas. Ins. Co.*, No. 13-513, 2013 WL 4041171, at *5 (M.D. Pa. Aug. 7, 2013); *Greater N.Y. Mut. Ins. Co. v. N. River Ins. Co.*, 872 F. Supp. 1403, 1409 (E.D. Pa. 1995) ("There is no common law tort action for bad faith or breach of fiduciary duty. The 'bad faith' statute provides the sole remedy for punitive damages for insureds … who allege bad faith or breach of fiduciary duty by an insurer.").

expense. After discovery, McMahon (ECF No. 35) and Medical Protective (ECF Nos. 34, 48) filed cross motions for summary judgment.[2]

## II.    Factual Background

### A.  The Malpractice Lawsuit

McMahon practices dentistry and is the owner of Esthetic Dentistry Pittsburgh, Inc. (Combined Concise Statement of Material Fact in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s CCS") ¶ 1, ECF Nos. 69, 70.) Medical Protective issued malpractice insurance policies to McMahon and Esthetic Dentistry Pittsburgh.[3] These policies had a combined per occurrence limit of $2 million. (Compl. Ex. A, ECF No. 1-1.)

In 2008, a third party (the "claimant") filed a dental malpractice lawsuit against McMahon and Esthetic Dentistry Pittsburgh in state court. (Combined Concise Statement of Material Facts Concerning the Motion for Summary Judgment of Defendant ("Def.'s CCS") ¶ A4, ECF Nos. 68, 71.) The claimant alleged she suffered an injury from dental treatment by McMahon. (Pl.'s CCS ¶ 4.) Pursuant to the terms of the insurance policies, Medical Protective defended McMahon against the malpractice lawsuit and appointed the law firm of Davies McFarland & Carroll as defense counsel. (*Id.*) Attorneys Daniel Carroll ("Carroll") and Kristin Pieseski ("Pieseski") acted as defense counsel. (Def.'s CCS ¶ A5.) Medical Protective's field claims manager assigned to the case was Kurtis Marshall ("Marshall"). (Marshall Dep. 7:13–23, Mar. 15, 2014, ECF Nos. 37-9, 49-9.)   Marshall reported to Antony Ball

---

2    The court has jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy, including punitive damages permitted by 42 Pa. Cons. Stat. § 8371, exceeds $75,000. *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993) ("When both actual and punitive damages are recoverable, punitive damages are properly considered in determining whether the jurisdictional amount has been satisfied.").

3    The policies issued to McMahon and Esthetic Dentistry Pittsburgh are identical in the provisions relevant to this case. (Compl. Ex. A, ECF No. 1-1.)

("Ball"), who was Medical Protective's national dental claims manager. (Ball Dep. 5:17–19, Mar. 15, 2014, ECF Nos. 37-3, 49-3.) Ball's supervisor was Robert Ignasiak ("Ignasiak"), senior vice president of claims for Medical Protective. (*Id.* at 6:22–7:6.) Timothy Kenesey ("Kenesey") was the chief executive officer of the company. (*Id.* at 55:10–12.)

Medical Protective considered the claim winnable at trial. In October 2010, Marshall estimated the probability of a defense verdict to be seventy-five percent. (Marshall Dep. 13:23–25.) The claimant had been a high wage earner, and she claimed she was unable to work as a result of her injury. In March 2011, Pieseski informed McMahon and Medical Protective that due to the claimant's anticipated income-impairment claim, the potential exposure in the event of an adverse jury verdict could exceed the $2 million policy limit. (Pieseski Dep. 13:20–17:9, Mar. 14, 2014, ECF No. 37-7.) The reports of the parties' economic damages experts confirmed the possibility of an adverse verdict well in excess of the policy limit. (Carroll Dep. 34:24–35:7, Feb. 28, 2014, ECF Nos. 37-8, 49-8.) Pieseski encouraged McMahon to consult with counsel about her personal assets in the event of a verdict exceeding the coverage limit. (Pieseski Dep. 15:2–16:11.) McMahon engaged Joseph Decker ("Decker") as her personal counsel. (*Id.* at 13:24–14:3.)

In May 2012, Medical Protective was still determined to proceed to trial. (*Id.* at 18:23–19:2.) In July 2012, Decker sent a letter to Pieseski and Carroll to demand that the case be settled within the policy limits. (*Id.* at 20:24–21:19.) In a pretrial report dated April 8, 2013, Pieseski estimated the chance of a defense verdict as fifty percent with respect to the standard of care and sixty percent with respect to causation. (Marshall Dep. 18:3–7.) On April 15, 2013, Pieseski sent Ball and Marshall a letter advising them that, due to new evidence from the claimant's expert witnesses, the chance of a successful defense verdict on causation was reduced to forty percent. (Pieseski Dep. 24:20–25:18.) The judge assigned to the trial declined to hold a hearing on challenges to the claimant's experts and deferred ruling on the admissibility of the

expert evidence until trial. (Ball Dep. 42:3–11.) Around that time, Ball spoke to McMahon on the phone. (*Id.* at 43:21–23.) McMahon again expressed her desire that the case be settled. (*Id.* at 44:17–21.) Ball told McMahon that Medical Protective would attempt to settle the case at an upcoming mediation, but she should prepare for the possibility of a trial. (*Id.* at 44:22–25.)

A mediation session was set for April 20, 2013, nine days before the scheduled trial date. Internally, Medical Protective "moved from defend to settle." (*Id.* at 59:9–10.) In an e-mail to Ignasiak and Ball, dated April 18, 2013, Kenesey authorized settlement up to the full policy limit of $2 million, although he stated the case "should be brought in for far less." (*Id.* at 54:22–56:15.) In turn, Ignasiak gave Ball settlement authority of $1.5 million. (*Id.* at 57:18–25.) Ball told Marshall, who would attend the mediation as Medical Protective's representative, that they had $1.5 million to settle the case. (*Id.* at 59:11–60:12.) Ball did not tell Marshall that Kenesey had internally authorized the full policy limit. (*Id.*) Ball did not tell Carroll or Pieseski the amount of his settlement authority. (*Id.*) Medical Protective's normal practice was not to inform defense counsel of its settlement limits. (Pieseski Dep. 27:2–28:19.) Marshall did not divulge his settlement authority until he had reached it, even when asked by Decker. Marshall's practice with respect to mediation was not to tell anyone what his authority was until he had extended it. (Marshall Dep. 29:21–30:11.)

### B. The Mediation Session

Present at the mediation for the defense side were claims manager Marshall, defense counsel Pieseski and Carroll, McMahon, and McMahon's personal attorney Decker. (Pieseski Dep. 30:10–16.) Medical Protective made an opening offer of $500,000, and the claimant's response to that offer was $1,975,000. (Carroll Dep. 68:1–21.) The negotiations proceeded "[i]ncredibly slowly." (Marshall Dep. 32:3.) Medical Protective made a series of offers, increasing from $1.1 million to $1.2 million and then $1.3 million. The claimant's response to the $1.3 million offer was a demand for $1.91 million. (Carroll Dep. 69:5–9.)

Because of the large gap between the parties and Marshall's unwillingness to disclose his settlement authority, Decker called Ball while the $1.3 million offer was on the table to find out what Medical Protective was willing to pay and to urge settlement. (Decker Dep. 6:18–25, Feb. 28, 2014, ECF Nos. 37-4, 49-4.) Ball testified he was "uncomfortable" sharing with Decker what Medical Protective was willing to pay to settle the lawsuit because it seemed that Decker was potentially in discussion with the claimant's counsel and Ball "didn't want the strength of [his] negotiating position compromised by anything that might be said advertently or inadvertently to [the claimant] or to the mediator." (Ball Dep. 66:10–19.) During the conversations, Decker and Ball discussed the possibility that McMahon contribute her own money. Decker commented that if McMahon were to contribute her own money to the settlement, she would do so under protest and reserving her rights against Medical Protective. (Decker Dep. 8:1–9.) Ball told Decker that Medical Protective would prefer that McMahon not put in her own money. (*Id.* at 12:19–21.) Ball testified that, through Decker, he "urge[d]" McMahon not to contribute and to let negotiation "play its course." (Ball Dep. 65:12–18.) Ball said, "[I]f you want to make a voluntary payment at your own expense, I can't stop you, but I would urge you not to." (*Id.* at 65:21–24.) Ball told Decker that the case "doesn't have to settle today." (Decker Dep. 21:23–24.) Decker asked whether Medical Protective would offer more than $1.3 million to settle closer to trial, and Ball said, "[N]o, that's it." (*Id.* at 22:1.)

Sometime after Decker spoke with Ball, Marshall offered $1.5 million, which he described as "the full amount of my authority." (Marshall Dep. 33:6–9.) While Medical Protective stuck to the $1.5 million offer, the claimant made several declining demands, first to $1.75 million and finally to $1.65 million. (Pieseski Dep. 33:20–25.) At that point, Marshall said, "I don't think it looks like we [are] going to get it done today." (Marshall Dep. 35:19–24.) Marshall, who had to catch a flight, started gathering his things to leave. (*Id.*) Pieseski sent an e-mail to a colleague at 5:29 p.m.

that said the case had not settled and they were concluding for the day. (Pieseski Dep. 34:1–23.)

During the mediation, McMahon began to consider contributing her personal funds to the settle the case. The parties dispute who first suggested this idea. McMahon testified that, during an impasse in the negotiations, Carroll asked Decker and her whether she had considered contributing her own money to facilitate a settlement. (McMahon Dep. 10:15–18, Mar. 14, 2014, ECF Nos. 37-6, 49-6.) McMahon understood Carroll to be recommending that she contribute. (*Id.* at 11:15–19.) According to McMahon, as the mediation was concluding, Carroll raised the issue for a second time and asked her whether she was "going to do something now?" (*Id.* at 9:19–20.) Carroll suggested that she privately discuss the matter with Decker. (*Id.* at 24:4–7.) Decker also testified that Carroll was the first to suggest that McMahon consider contributing to the settlement. (Decker Dep. 10:1–11:17.) Carroll denies making these statements. Carroll testified that Decker bought up the idea of McMahon contributing her money. (Carroll Dep. 72:1–22). According to Carroll, neither Pieseski nor he ever raised this issue with McMahon or offered any input about whether she should contribute money. (*Id.* at 74:25–76:8.)

The parties do not dispute that, at the apparent conclusion of the mediation, McMahon and Decker spoke privately about McMahon making a personal contribution to the settlement. McMahon then offered $50,000 of her own money to "bridge the gap" between the claimant's demand and what Medical Protective was offering. The mediator conveyed the total offer of $1,550,000 to the claimant, who accepted it. A one-page mostly handwritten settlement agreement was prepared to memorialize the agreement. The agreement recognized an amicable resolution of the case for the sum of $1,550,000. "Payment of $1,500,000.00 to be made within 10 days; payment of additional $50,000.00 within 30 days." (Settlement Agreement, Ex. 12, ECF No. 47.) McMahon signed the agreement as "Defendant Representative" and Pieseski signed as "Defense Counsel." The agreement was also signed by the mediator, the claimant,

and the claimant's counsel. After the agreement was reached, but before the written agreement was prepared, Marshall left for the airport. He did not see or sign the agreement. (Marshall Dep. 37:25–38:16.)

Before leaving the mediation, Marshall told McMahon that he would call Ball on the way to the airport to see whether Medical Protective would directly pay the $50,000 McMahon committed to the settlement. (McMahon Dep. 30:16–19.) Ball was surprised to hear that the case had settled because he had thought the negotiations would continue for several more days. (Ball Dep. 69:10–20.) Ball testified that Medical Protective was prepared to offer up to the $2 million policy limit after the mediation if necessary to settle the case. (*Id.* at 77:17–19.) Ball considered the request that Medical Protective reimburse McMahon for her contribution to the settlement, and he decided it would not. (*Id.* at 70:7–14.) Ignasiak supported Ball's decision. (*Id.*)

### C. Relationship Between Davies McFarland & Carroll and Medical Protective

Davies McFarland & Carroll handled many Medical Protective cases, including most dental cases in the Pittsburgh region. (Marshall Dep. 12:3–9.) Since 1978, Carroll had maintained a caseload of forty to sixty Medical Protective cases. (Carroll Dep. 110:18–25.) During the claimant's case, Pieseski and Carroll sent "Attorney Suit Reports" to Medical Protective at regular intervals. (Pieseski Dep. 10:20–11:12.) The reports described the status of the case, including the attorneys' analysis of the legal merits of the claims. (*Id.*) The attorney-client privilege extended among the defense attorneys, the client (McMahon), and the carrier (Medical Protective). Pieseski considered the reports to be privileged documents. (*Id.* at 13:3–11.) Pieseski did not always send the attorney suit reports to McMahon, although she informed McMahon about the substance of the reports. (*Id.* at 20:3–17.)

## III. Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material when it "might affect the outcome of the suit under the governing law"—factual disputes that are "irrelevant or unnecessary" will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.").

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). Summary judgment must be entered, "'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## IV.    Discussion

The possibility of a verdict in excess of policy limits can lead to tension between an insured and an insurer. The Superior Court of Pennsylvania explained how this situation could lead to divergent interests:

> If an insurer is exposed only to liability up to the limit of its policy, and any settlement would be at or near that level, then even a modest chance of obtaining a defense verdict might be sufficient in a self-interested cost-benefit analysis to convince an insurer to litigate despite the prospect of a verdict in excess of the policy limits.

*Babcock & Wilcox Co. v. Am. Nuclear Insurers*, 76 A.3d 1, 6 (Pa. Super. Ct. 2013). This case arises out of that tension. Medical Protective argues it was adhering to its negotiation strategy by sticking to its last settlement offer of $1.5 million. The claimant reduced her demand several times, which Medical Protective cites as evidence that this strategy was having some success. McMahon argues this stand-fast negotiation strategy was operating at her expense because she bore the risk if the case went to trial. McMahon asserts two claims, i.e., Medical Protective breached the contract and acted in bad faith. Each claim will be separately addressed.

### A. Breach of Contract

There are two bases for the breach of contract claim: (1) Medical Protective failed to comply with the terms of the insurance policy, and (2) Medical Protective breached the implied duty of good faith and fair dealing—that is, it acted in bad faith. Each of those claims will be discussed.

### 1. Breach of the Terms of the Contract

McMahon alleges Medical Protective breached the insurance contract by failing to pay the entire settlement amount. (Pl.'s Br. 8, ECF Nos. 36, 45.) Under Pennsylvania law, to recover for breach of contract, a plaintiff "must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). The parties do not dispute that the insurance policies covered the malpractice claim. The applicability of a policy exclusion, the issue in this case, is an affirmative defense on which the insurer bears the burden of proof. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) ("Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does.").

The exclusion at issue is found in "Condition 2" of the policy, and it restricts the insured from settling without the authorization of the insurer. It provides, in relevant part,

> [t]he Insured shall not contract any expense nor make or contract any settlement of a claim hereunder, except at the Insured[']s own cost and responsibility, without the written authorization of [Medical Protective].

(Compl. Ex. A, ECF No. 1-1.) Medical Protective asserts that, under this provision, the $50,000 paid by McMahon was a voluntary contribution at her own cost and responsibility. McMahon argues the exclusion in Condition 2 does not apply because (1) it only applies to a settlement entered into by the insured alone and not a settlement jointly entered into by the insured and insurer, and (2) the settlement agreement constituted written authorization. (Pl.'s Br. 8, ECF No. 36, 45.) Each of these arguments will be addressed in turn.

(a) Joint Settlement

McMahon argues that Condition 2, by its terms, does not apply to settlements jointly contracted by the insured and insurer. (*Id.* at 9.) An insurance policy is a contract, and the court must "determine the intent of the parties as disclosed by the language of the policy." *Houghton v. Am. Guar. Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir. 1982). "Where the language is clear and unambiguous, the express terms of the contract will control." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 452 (3d Cir. 2006). "The court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Id.* (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). Where the terms of a policy are ambiguous, the court construes the ambiguity against the insurer. *Houghton*, 692 F.2d at 291. The court, however, may not torture the language of the policy to create ambiguity where none exists. *Id.*

The language of the exclusion is unambiguous. The insured shall "not make … *any* settlement of a claim" except at the insured's "own cost and responsibility."

(Compl. Ex. A, at 5, ECF 1-1 (emphasis added).) Nothing in the exclusion indicates that it applies only to settlements made solely by the insured, and not to settlements in which the insured agrees to pay more than offered by the insurer. The purpose of a clause restricting unauthorized settlement is "to prevent collusion and to grant the insurer the right to take complete and exclusive control of the settlement and defense of claims or suits against the insured." 14 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 203:3 (2008) (footnote omitted). McMahon argues that there was no collusion between McMahon and the claimant in making the settlement because the insured and insurer were in the same room all day. (Pl.'s Br. 10, ECF Nos. 36, 45.) Even in the absence of collusion, the no-unauthorized-settlement clause gives Medical Protective the authority to control the defense of the case, including settlement. *Babcock & Wilcox*, 76 A.3d at 20 ("When an insured avails itself of the insurer's obligation to defend, the insured remains bound to the corollary requirement that the insurer have sole authority to control the defense.").

McMahon argues "[t]here was no usurpation of control or 'interference' with the compromise" of the malpractice lawsuit because Medical Protective "agreed with the contract of settlement." (Pl.'s Resp. Br. 9, ECF Nos. 55, 59.) According to McMahon, if Medical Protective "disagreed and thought that an additional $50,000 was too much money to settle, it certainly had the right to continue to litigate." (*Id.*) Medical Protective could have withdrawn its offer and proceeded to trial or attempted to settle later. By agreeing to the settlement, McMahon argues, Medical Protective "made or contracted the settlement" together with McMahon. (*Id.* at 10 (internal quotation marks omitted).)

According to McMahon's argument, Medical Protective could choose between agreeing to pay toward the settlement the $1.5 million it offered—thus binding itself to pay the extra $50,000 agreed to by McMahon—and quashing the proposed settlement altogether. The language of the policy does not require this choice. Under the terms of Condition 2, the insured may agree to pay an expense or enter into a

settlement at the insured's expense without breaching the contract. The plain language of the contract permits settlements to which the insurer and insured both contribute.

The typical dispute where an insurer refuses to reimburse an insured pursuant to a no-unauthorized-settlement provision involves a settlement contracted by the insured with no involvement by the insurer. *See, e.g.*, *Perini/Thompkins Joint Venture v. ACE Am. Ins. Co.*, 738 F.3d 95 (4th Cir. 2013) (holding that insured violated the terms of its insurance policies by not obtaining insurer's consent before settling and therefore could not claim reimbursement under the policies); *Vincent Soybean & Grain Co. v. Lloyd's Underwriters of London*, 246 F.3d 1129 (8th Cir. 2001) (per curiam) (holding that insurer's refusal to reimburse insured for settlement made by insured without insurer's consent was not a breach of contract or bad faith under a no-unauthorized-settlement provision). Often these cases arise when the insurer is defending the suit while reserving its right to assert that there is no coverage under the policy. *See, e.g.*, *Babcock & Wilcox*, 76 A.3d 1. This case does not fit neatly into either of those situations. Here, Medical Protective accepted coverage, participated in the settlement negotiations, and paid the majority of the settlement. The court did not locate any decision squarely addressing this situation. Medical Protective points to *Trinity Outdoor, LLC v. Central Mutual Insurance Co.*, 679 S.E.2d 10 (Ga. 2009), and *Finkelstein v. 20th Century Insurance Co.*, 14 Cal. Rptr. 2d 305 (Cal. Ct. App. 1992), as analogous, but McMahon argues these decisions are distinguishable.

In *Trinity Outdoor*, the insurer offered $200,000 on behalf of its insured to settle a wrongful death lawsuit with multiple defendants. *Trinity Outdoor*, 679 S.E.2d at 11. The insured feared a verdict in excess of the $2 million policy limits, and agreed to contribute $954,530 to the settlement. The insurer refused to compensate the insured for the $754,530 above the insurer's settlement offer, which it deemed a voluntary payment. *Id.* The insured sued for breach of contract and statutory bad faith. The Supreme Court of Georgia, in response to two questions certified by the United States

District Court for the Northern District of Georgia, held that the insured's claim failed for three reasons. *Id.* at 12. The insurance policy stated that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than first aid, without our consent." *Id.* (internal quotation marks omitted). The court determined that the extra $754,530 was a voluntary payment and therefore not subject to indemnification by the insurer. *Id.* The court found that the insurer's suit could not proceed due to policy provisions stating the insurer would only pay sums that the insured was legally obligated to pay and requiring any lawsuit to be based on "a settlement agreement to which [the insurer] agreed or a final judgment entered after an actual trial." *Id.*

McMahon distinguishes *Trinity Outdoor*[4] based upon the provision in that insurance contract requiring a settlement agreement to which the insurer agreed. (Pl.'s Reply Br. 2, ECF Nos. 62, 63.) McMahon argues that in this case Medical Protective agreed to the settlement, as evidenced by the signature of Pieseski. (*Id.*) This argument, however, is directed toward the contention that the settlement agreement constituted Medical Protective's written authorization. *Trinity Outdoor* supports Medical Protective's contention that a policy provision requiring the insurer's consent to settlement applies when the insurer and insured both contribute to the settlement.

The decision in *Finkelstein* involved the settlement of an underlying automobile accident lawsuit. The insured had a policy with an applicable coverage limit of $100,000. *Finkelstein*, 14 Cal. Rptr. 2d at 306. The insured had pleaded guilty to drunk driving in connection with the accident, and had the case gone to trial, there was, in the opinion of the insured's counsel, "no doubt" of a verdict against him in excess of the coverage limit. *Id.* The insurer offered $75,000 to settle the case. The case ultimately settled for $85,000. Of that amount, the insurer paid $75,000, $3,300 was a credit for restitution payments already made by the insurer on the insured's behalf in

---

4    McMahon's brief misidentified the case name.

connection with the criminal proceedings against the insured, and the insured paid $6,700 from his personal funds. *Id.* The insured sued to recover the $6,700. The policy stated that "insured shall not, except at their own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of injury." *Id.* at 307 n.2. The court held that "an insured does not have a cause of action for breach of the implied covenant of good faith and fair dealing when the insurer does not settle upon the insured's demand and the insured then strikes his own deal with the third party claimant to settle the action." *Id.* at 306. The court declined to find bad faith on the part of the insurer and concluded that the insured contributed to the settlement "because of his own conscience and his personal motivation of assisting in his alcoholic rehabilitation" rather than being subject to duress by the insurer. *Id.* at 307.

McMahon distinguishes *Finkelstein* because McMahon's contribution was made under a reservation of rights against Medical Protective and was not "voluntary." (Pl.'s Reply Br. 1, ECF Nos. 62, 63.) This difference does not distinguish the implicit holding of *Finkelstein* recognizing that restrictions on an insured settling a case apply even when the insurer contributes to the settlement reached by the insured. McMahon's arguments with respect to the involuntariness of her contribution will be addressed under the bad faith analysis. Although *Trinity Outdoor* and *Finkelstein* do not apply Pennsylvania law, as a general matter, they illustrate that a no-unauthorized-settlement provision may apply even where the insurer agrees to pay part of the settlement. McMahon offered no contrary authority.

The court finds that the Condition 2 exclusion is unambiguous as a matter of law. The exclusion is applicable to McMahon's payment of $50,000 as part of the settlement of the malpractice case.

### (b) Settlement Agreement Constitutes "Written Authorization"

McMahon argues that the settlement agreement constitutes Medical Protective's written authorization for McMahon's contribution because Pieseski signed the

agreement. (Pl.'s Br. 10, ECF Nos. 36, 45.) This argument raises two issues: (1) did the terms of the settlement agreement authorize McMahon's contribution so that Medical Protective is obligated to indemnify her, and (2) was Pieseski an agent of Medical Protective such that her signature bound Medical Protective. McMahon recognizes that Medical Protective did not authorize "a settlement committing itself to pay the $50,000 that Dr. McMahon[] contributed while reserving her rights." (Pl.'s Resp. Br. 10, ECF Nos. 55, 59.) McMahon argues, however, that Medical Protective "did authorize the settlement agreement as a whole" and thus Condition 2 does not apply. (*Id.*) For the reasons set forth below, no reasonable jury could find that the settlement agreement constituted written authorization for McMahon to contribute to the settlement at anything other than her "own cost and responsibility."

The settlement agreement does not, by its explicit terms, bind Medical Protective to pay the full settlement amount. The agreement does not mention Condition 2 or purport to consent to the payment of the $50,000. The settlement agreement stated that payment of $1,500,000 was to be made within ten days and payment of an additional $50,000 was to be made within thirty days. Medical Protective and McMahon understood that Medical Protective was to pay the $1,500,000 and that McMahon committed to pay the $50,000. (McMahon Dep. 29:5–23.) Moreover, Ball told Decker that Medical Protective could not stop McMahon from making a payment at her own cost, but he urged McMahon not to do so. (Ball Dep. 65:21–24.)

In interpreting a contract, the court must give effect to the intent of the parties. Based upon Ball's testimony, which is not disputed on this point, Medical Protective did not intend the settlement agreement to bind it to pay the additional $50,000. McMahon concedes this point. (Pl.'s Resp. Br. 10, ECF Nos. 55, 59.) The parties, including McMahon, understood that McMahon was committing to pay the $50,000 personally, albeit under a claim of right to recover the money from Medical Protective. Medical Protective's agreement to pay the $1.5 million it previously offered in

combination with McMahon's $50,000 did not constitute "written authorization" binding it to reimburse her.[5]

Based upon the terms of the insurance policies, Medical Protective's refusal to reimburse McMahon was not a breach of contract.

## 2. Violation of the Implied Duty of Good Faith and Fair Dealing

McMahon additionally argues that the conduct of Medical Protective breached the contract by violating the implied duty of good faith and fair dealing—that is, Medical Protective acted in bad faith.

McMahon asserts that Medical Protective acted in bad faith by (1) failing to disclose its full settlement authority to McMahon at several points during the mediation, and (2) inviting plaintiff to contribute to the settlement. (Pl.'s Br. 15–17, ECF Nos. 36, 45.) Medical Protective argues it had a reasonable basis for not disclosing its internal authority and settlement strategy and that none of its representatives "invited" McMahon to contribute her personal funds to the settlement.

Insurance bad faith under Pennsylvania law has a somewhat tortuous history. *See* Richard L. McMonigle Jr., Insurance Bad Faith in Pennsylvania §§ 2:01–2:09 (15th ed. 2014). Pennsylvania law provides, in the context of a third-party claim,[6] two

---

5    McMahon argues that Medical Protective's admission to the allegations in paragraph 49 of the complaint is binding and proves that Pieseski was representing Medical Protective when she signed the settlement agreement. (Pl.'s Resp. Br. 10, ECF Nos. 55, 59.) Paragraph 49 of the complaint states, in relevant part:

> In the mediation room on April 20, 2013, Dr. McMahon and MedPro (represented by the Davies Law Firm) signed a one page written agreement memorializing the settlement, entitled "Settlement Agreement," which also was signed by [the claimant], [the claimant's] counsel and the Mediator.

(Compl. ¶ 49, ECF No. 1.) Medical Protective admitted to the allegations in this paragraph without qualification. (Answer ¶ 49, ECF No. 8.) This argument is unpersuasive because, even if Pieseski's signature bound Medical Protective, the parties to the settlement agreement did not intend for the agreement to be the "written authorization" required by Condition 2.

6    In a third-party or liability insurance policy, the insurer promises to defend and indemnify the insured from liability for claims against the insured arising out of the insured's conduct. *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d

16

kinds of actions for insurance bad faith, both of which McMahon asserts in this case: a claim for breach of the insurance contract's implied duty of good faith and a claim for violation of Pennsylvania's insurance bad faith statute, 42 PA. CONS. STAT. § 8371. *NIA Learning Ctr., Inc. v. Empire Fire & Marine Ins. Cos.*, Civil No. 05-5178, 2009 WL 3245424, at *11 (E.D. Pa. Oct. 1, 2009) ("Federal courts in Pennsylvania generally recognize that a contractual bad faith claim and a statutory bad faith claim are entirely separate causes of action."). The claim for violation of the bad faith statute is separately addressed.

The seminal decision establishing Pennsylvania's contractual bad faith action is *Cowden v. Aetna Casualty & Surety Co.*, 134 A.2d 223 (Pa. 1957).[7] Under *Cowden* and its progeny, if an insurer breaches the contractual duty of good faith, the insured is entitled to recover known and foreseeable compensatory damages that flow from the insurer's bad conduct. *Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 389–90 (Pa. 2001). An insurer that refuses to settle in bad faith may be liable for the full amount of any verdict against the insured, even if the verdict exceeds the coverage limits of the policy. *Id.* at 388 n.16.

The standard for liability applicable to a claim asserted under *Cowden* is not entirely clear under Pennsylvania law. In *DeWalt v. Ohio Casualty Insurance Co.*, 513 F Supp. 2d 287 (E.D. Pa. 2007), the district court observed that neither the Pennsylvania Supreme Court nor the Court of Appeals for the Third Circuit applied the two-part standard for statutory bad faith—which was set forth by the Pennsylvania Superior Court in *Terletsky v. Prudential Property & Casualty Insurance Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1984), and adopted by the Third Circuit Court of Appeals in *Klinger v.*

---

226, 233 (3d Cir. 2002). First-party coverage protects against loss or injury to the insured or the insured's property. *Id.*

7    The *Cowden* decision did not address whether the bad faith action it recognized sounded in contract or tort. In *Birth Center v. St. Paul Companies, Inc.*, 787 A.3d 376 (Pa. 2001), the Pennsylvania Supreme Court held that the common law bad faith action arises under contract law. *Id.* at 389; *id.* at 390 (Nigro, J., concurring).

*State Farm Mutual Automobile Insurance Co.*, 115 F.3d 230, 233 (3d Cir. 1997)—to contractual bad faith claims. *DeWalt,* 513 F. Supp. 2d at 295. The district court concluded that a claim asserted under *Cowden* may be premised on an insurer's negligence or unreasonableness in handling the potential settlement of claims against its insured, and does not require proof of recklessness or purposefulness. *Id.* at 297; *see Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 237 (3d Cir. 2003) ("'Pennsylvania law makes clear that an insurer may be liable ... if it *unreasonably* refuses an offer of settlement.'" (emphasis added) (quoting *Birth Ctr. v. St. Paul Cos., Inc.*, 727 A.2d 1144, 1157 (Pa. Super. Ct. 1999))). The court, however, concluded that the clear and convincing standard of proof applies to claims asserted under *Cowden. DeWalt*, 513 F. Supp. 2d at 292. The analysis of the court in *DeWalt* is persuasive. In the absence of controlling authority from the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit, this court will adopt the standards set forth in *DeWalt*.[8]

---

8    Other decisions have recognized the persuasiveness of the analysis in *DeWalt. See Leporace v. N.Y. Life & Annuity Corp.*, Civil No. 11-2000, 2014 WL 3887726, at *1 (E.D. Pa. Aug. 7, 2014) ("After considerable research on the nature of these claims in this and other cases, the Court believes that [*DeWalt*] is a succinct and accurate reflection of the somewhat confusing history of Pennsylvania jurisprudence on these issues and accurately reflects the legal nature of these claims."); *McPeek v. Travelers Cas. & Sur. Co. of Am.*, Civil No. 06-114, 2007 WL 1875801, at *3 (W.D. Pa. June 27, 2007) ("This Court is persuaded by the analysis in *DeWalt* and will apply the test for common law bad faith and the more rigorous standard of review set forth in that opinion.").

At least one commentator has criticized the application of a negligence standard to third-party bad faith claims. RICHARD L. MCMONIGLE JR., INSURANCE BAD FAITH IN PENNSYLVANIA § 3:13 (15th ed. 2014) ("The conclusion that the applicable standard in a third party bad faith claim is one of negligence is troubling. . . . Clarification of the nature of the common law bad faith claim and the appropriate standard of proof are important issues that require future appellate attention."). The court notes that a negligence standard conflicts with general statements in other contexts that "'mere negligence or bad judgment is not bad faith.'" *See, e.g., Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)). Nevertheless, under the applicable case law, negligence is the best-supported standard.

A typical claim under *Cowden* arises when an insurer unreasonably fails to settle and a verdict in excess of the policy limits is returned against the insured. The Pennsylvania Supreme Court held that, under a provision prohibiting unauthorized settlement, the insurer has the right "to make the decision as to whether a claim against the insured should be litigated or settled, [but] it is not a right of the insurer to hazard the insured's financial well-being."[9] *Cowden*, 143 A.2d at 228. In *Cowden*, the insurer rejected a proposal by the insured to settle the case for the full policy limits plus a voluntary contribution by the insured. *Id.* at 226–27. A jury returned a verdict against the insured substantially in excess of the policy limits. The insured sued the insurer for the difference between the voluntary contribution he was willing to make and the amount in excess of the policy limits he was obligated to pay. *Id.* The Pennsylvania Supreme Court held that, "when there is little possibility of a verdict or settlement within the limits of the policy," the insurer must have "a bona fide belief … that it has a good possibility of winning the suit" before it commits to a trial. *Id.* at 228. "Good faith requires that the chance of a finding of nonliability be real and substantial and that the decision to litigate be made honestly." *Id.*

Although there was no excess verdict in this case, several district courts have addressed the possibility of contractual bad faith in the absence of an excess verdict. In *Daniel P. Fuss Builders-Contractors, Inc. v. Assurance Co. of America*, Civil No. 06-1182, 2006 WL 2372226 (E.D. Pa. Aug. 11, 2006), Fuss Builders, a construction company, failed to protect a project from water damage. Fuss Builders admitted its negligence and asked its insurer to settle. The insurer refused to settle, and the damaged third party sued Fuss Builders. After four years of litigation, the insurer settled with the third party. Fuss Builders sued the insurer, alleging the insurer's bad faith refusal to timely settle with the third party disrupted the relationship between

---

9    The provision at issue in *Cowden* provided that "the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company." *Cowden*, 134 A.2d at 225.

Fuss Builders and the third party and damaged Fuss Builders' business. The district court noted that no federal or state court in Pennsylvania had recognized a cause of action for delay in settling a third-party claim. *Id.* at *4. Calling the allegations "a disturbing picture of improper conduct" by the insurer, the court nevertheless refused to "create a cause of action not yet recognized by Pennsylvania law." *Id.* at *4–5.

The court in *Gideon v. Nationwide Mutual Fire Insurance Co.*, Civil No. 07-40, 2008 WL 768724 (W.D. Pa. Mar. 20, 2008), explicitly disagreed with the holding in *Fuss Builders. Id.* at *9. The case was before the court on a motion to dismiss. The plaintiff alleged that the insurer failed to perform a reasonable investigation, engaged "in [a] pattern of conduct designed to frustrate and delay the resolution of the claim," failed to engage in good faith settlement negotiations, and continued to pursue a declaratory judgment action against the insured even after discovery made it clear the action could not succeed, among other things. *Id.* at *7. The court found that these allegations were sufficient to state claims for breach of contract and statutory bad faith. *Id.* at *6, 8.

In *Standard Steel, LLC v. Nautilus Ins. Co.*, Civil No. 08-195, 2008 WL 4287156 (W.D. Pa. Sept. 17, 2008), the court denied the insurer's motion to dismiss, in which the insurer argued that there can be no bad faith claim where no excess verdict had been entered. *Id.* at *4 (rejecting reliance on *Fuss Builders*).

The most recent decision to address this issue is *Bodnar v. Nationwide Mutual Insurance Co.*, Civil No. 12-1337, 2013 WL 2147807 (M.D. Pa. May 16, 2013). In that case, the insurer argued that its payment of the policy limits before the entry of a verdict against its insured was a complete defense to a bad faith claim. *Id.* at *15. The court observed that the Pennsylvania Supreme Court has not ruled on that issue, *id.* at *12, and analyzed the relevant decisions, including *Fuss Builders*, *Gideon*, and *Standard Steel*. The court noted that delay in settlement alone might not support a claim, but held that "an insurer's payment of the policy limits prior to a verdict cannot insulate an insurer from claims of breach of contract and bad faith in connection with

its conduct prior to its payment." *Id.* at *15. The court summarized the kinds of allegations that support a finding of bad faith conduct prior to settlement:

> [A]llegations of a failure to conduct a complete and thorough investigation of the facts giving rise to the claim, or the law supporting it, the refusal to enter into good faith settlement negotiations or the conduct of "surface" negotiations under-taken with no genuine intent to find a basis for settlement, the rejection without counterproposal of all offers made by the third party for settlement, the filing and pursuit of actions for declaratory judgment without a reasonable evidentiary basis for doing so, if persisted in for an unreasonable period of time, will state a cause of action for breach of contract and for bad faith even if ultimately, after the insured has been prejudiced by the insurer's conduct delaying resolution of the claim against it, the insurer pays the policy limits prior to the entry of a verdict.

*Id.*

Based upon the reasoning in these decisions, the court predicts that entry of an excess verdict is not a prerequisite for a third-party bad faith claim under Pennsylvania common law.

The court must apply this standard to discern whether there are genuine issues of material fact in dispute with respect to whether Medical Protective acted in bad faith by (1) refusing McMahon's request to inform her what Medical Protective was willing to pay to settle the case and (2) inviting her to contribute her own money to the settlement.

### (a) Refusal to Disclose Internal Settlement Limits

Decker asked Marshall and Ball several times both before and during the mediation session what Medical Protective would be willing to pay to settle the malpractice lawsuit. They each declined to inform him. McMahon argues that Medical Protective was her fiduciary and that a fiduciary cannot "bluff, deceive, or be less than forthright with its principal during the negotiations." (Pl.'s Br. 17, ECF Nos. 36, 45.) McMahon argues that *Birth Center* establishes Medical Protective's fiduciary

duty to "disclose its 'ultimate settlement position' to its insured." (Pl.'s Resp. Br. 17, ECF Nos. 55, 59.) In *Birth Center*, the Pennsylvania Supreme Court stated that "[w]here the insurance company takes control of the decision to settle or litigate actions brought by third parties, the insurance company owes its policyholder a fiduciary duty, among other things, to engage in good faith settlement negotiations." *Birth Ctr.*, 787 A.2d at 388 n.17; *accord Gedeon v. State Farm Mut. Auto. Ins. Co.*, 188 A.2d 320, 322 (Pa. 1963) ("[B]y asserting in the policy the right to handle all claims against the insured, including the right to make a binding settlement, the insurer assumes a fiduciary position towards the insured and becomes obligated to act in good faith and with due care in representing the interests of the insured.").

In other contexts, the Pennsylvania Supreme Court has noted that a fiduciary relationship is similar to an agency relationship: "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff*, 528 A.2d 1318, 1323 (Pa. 1987). An agent-principal fiduciary relationship requires the fiduciary to act solely for the benefit of the principal. "[I]n all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information." *Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000). When the Pennsylvania Supreme Court discussed the "fiduciary duty" of an insurer in handling third-party claims against its insured, the court did not intend for the insurer to be considered an agent of the insured.[10] As the supreme

---

10    One commentator noted that courts' use of the term "fiduciary" in this context can lead to confusion:

> In the context of the insurance relationship, use of the term "fiduciary" is somewhat descriptive of the role of the insurer when it undertakes to defendant or settle cases where the insured's personal interests are at stake. There, the insured does "surrender substantial control" over the conduct of one aspect of the insured's affairs. However, the phrase "fiduciary relationship" should be used carefully because of other connotations and confusion it may invite. Like the rhyme that a school child cannot hear repeated too often, the phrase loses its meaning with overuse.

court noted in *Cowden*, "there is no absolute duty on the insurer to settle a claim when a possible judgment against the insured may exceed the amount of the insurance coverage." *Cowden*, 134 A.2d at 228. The insurer need not "submerge its own interest in order that the insured's interest may be made paramount." *Id.* Instead, the insurer "must accord the interest of its insured the same faithful consideration it gives its own interest." *Id.*

The duty of good faith owed by an insurer to its insured does not require the same level of selflessness as an agent-principal fiduciary relationship. *Birth Center*, when understood in this light, does not require disclosure of "all relevant information" such as its internal settlement authority or negotiation strategy. McMahon did not cite any decision from any jurisdiction that found an insurer's refusal to inform the insured about its negotiating strategy constituted bad faith. The court is not aware of any such decision. In the absence of any authority, the court is not convinced that this requirement is part of Pennsylvania law.

Although there is no requirement that an insurer disclose the upper limit of what it is willing to pay, the insurer may not make misrepresentations about that information to the insured. A misrepresentation by the insurer supports a finding of bad faith in the context of first-party claims. *See UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 505 (2004); *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 524 (W.D. Pa. 2012); *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. Ct. 2004). There appears to be no principled difference when a misrepresentation by an insurer to the insured is made during settlement of a third-party claim. The court concludes that an insurer's misrepresentation to an insured can be considered evidence of bad faith.

An insurer's failure to communicate with the insured can support an inference that the insurer did not adequately consider the interests of the insured. For example, an insurer's failure to inform its insured about a settlement offer is evidence of bad

---

Anthony P. Picadio & Bridget M. Gillespie, Norton on Insurance Coverage in Pennsylvania § 1.B(3) (2d ed. 2006).

faith. *See Haugh*, 322 F.3d at 238 (noting that insurer's failure to inform insured of settlement offer "could constitute evidence of bad faith"); *Schubert v. Am. Indep. Ins. Co.*, Civil No. 02-6917, 2003 WL 21466915, at *3 (E.D. Pa. June 24, 2003) ("[T]he failure to inform an insured of an offer to settle may be evidence of whether the [insurer] had the insured's interests in mind, [but] it is does not constitute bad faith *per se*."). As the district court noted in *DeWalt,* for an insurer's lack of communication to support a bad faith claim, there must be "sufficient evidence to allow a jury to conclude that the lack of communication in some way caused the excess verdict." *DeWalt*, 513 F. Supp. 2d at 303. While there was no excess verdict in this case, these decisions are analogous to the present situation where the insured paid personal funds to settle a case within the policy limit. The court predicts, therefore, that under Pennsylvania law, a bad faith claim may be supported by evidence that an insurer made a misrepresentation to the insured or failed to communicate with the insured, if the misrepresentation or failure to communicate caused the insured to make a personal contribution to a settlement within policy limits.

Medical Protective cites law review articles for the proposition that tactics obscuring the parties' positions are accepted in negotiations. (Def.'s Br. 14, ECF Nos. 37, 49.) *See* Art Hinshaw & Jess K. Alberts, *Doing the Right Thing: An Empirical Study of Attorney Negotiation Ethics*, 16 Harv. Negot. L. Rev. 95, 109 (2011) ("[L]awyers must be well-versed in several time-tested deceptive bargaining tactics. . . . [N]egiotiation has its own set of rules that legitimize deception short of fraud."); James J. White, *Machiavelli and the Bar: Ethical Limitations on Lying in Negotiation*, 1980 Am. B. Found. Res. J. 926, 928 ("To conceal one's true position, to mislead an opponent about one's true settling point, is the essence of negotiation."). Although "puffing" and other deceptive practices are permitted in arm's-length negotiations, the same is not true for discussions between a fiduciary and a principal. *See Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) ("Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by

fiduciary ties."). The court does not hold that the law requires an insurer to disclose its internal limits or strategy to its insured, but if the applicable fiduciary standard is that an insurer must accord the interest of the insured the same consideration it gives its own interest, an insurer cannot misrepresent or omit to provide material information to its insured when asked by an insured considering a personal contribution to settlement. In other words, if the insurer were in the same position as the insured, the insurer needs to act the way it would if it had to make the same decision as the insured.

Decker testified that he asked Ball during the mediation whether Medical Protective would offer more money than the $1.3 million offer on the table. According to Decker, Ball said $1.3 million was all the authorization he had and Medical Protective would not offer more. Viewed in the light most favorable to McMahon, this statement was untrue (although likely not material since Medical Protective later made a higher offer). Subsequently, Marshall offered $1.5 million and said that it was the limit of his authority. This statement was true—Marshall was only authorized to offer $1.5 million—but a reasonable jury could infer from this statement and the earlier statement of Ball that McMahon was misled into believing that $1.5 million was the absolute limit of what Medical Protective was willing to offer. Moreover, both Ball and Marshall knew that McMahon was considering making a personal contribution. When McMahon and Decker came back from their private consultation and put her $50,000 on the table, no representative of Medical Protective informed her that Medical Protective would continue to attempt to settle the suit by, if necessary, making a higher offer closer to the date of trial. Marshall was unaware that higher authority had been internally authorized, and Ball was unaware of McMahon's contribution until after the settlement had been reached. A reasonable jury could conclude that Medical Protective acted negligently in failing to inform McMahon that it would continue to negotiate and, if necessary, offer more, and that this failure was a material omission that McMahon relied upon to her detriment. The

jury will have to resolve whether McMahon would have offered her own money had she known about Medical Protective's willingness to pay more closer to trial.

While it is a close call, particularly in light of the clear and convincing evidentiary burden, there is factual dispute about whether the statements of Ball and Marshall—alone or together with a failure to inform McMahon that Medical Protective was willing to pay more than $1.5 million to settle the claimant's case—constitute contractual bad faith. This dispute precludes awarding summary judgment in Medical Protective's favor with respect to this issue. The determination whether Medical Protective negligently acted in bad faith is context specific. A reasonable jury could find that Medical Protective acted negligently, given its duty to afford McMahon's interests the same consideration as its own, because: (1) Ball told Decker that Medical Protective would not offer more than $1.3 million, even after the mediation; (2) Ball did not tell Marshall that Medical Protective would consider offering more than $1.5 million after the mediation, if necessary to settle the claim; (3) Marshall told McMahon and Decker that $1.5 million was the limit of his authority; and (4) when McMahon placed her own money on the table, neither Marshall nor Ball told her that Medical Protective would offer more, if necessary, to settle the case. A reasonable jury could conclude that these actions or inactions caused McMahon to contribute her own money to the settlement.

(b) Invitation to Contribute

McMahon asserts that Carroll, on two occasions during the mediation, suggested that she consider contributing personal funds to the settlement. Carroll denies making these statements. This dispute need not preclude the court from granting Medical Protective's motion for summary judgment if (1) an insurer's invitation to contribute to a settlement does not, as a matter of law, constitute bad faith, or (2) Carroll was not acting as an agent of Medical Protective when he made the alleged invitation.

In support of the argument that it is bad faith for an insurer to invite its insured to contribute to a settlement within policy limits, McMahon cites *Rova Farms Resort, Inc. v. Investors Insurance Co. of America*, 323 A.2d 495 (N.J. 1974). In that case, the Supreme Court of New Jersey noted a number of decisions in which "[a] demand that the insured contribute to a settlement for an amount within policy limits" was either a factor or the sole factor supporting "excess liability on a carrier." *Id.* at 501 n.3. Other courts and commentators generally agree with this proposition. *See, e.g.*, *Brochstein v. Nationwide Mut. Ins. Co.*, 448 F.2d 987, 990 (2d Cir. 1971) (holding that insurers must not "insist[] upon a contribution [by the insured] as the price of settlement." (internal quotation marks omitted)); *Brown v. U.S. Fid. & Gaur. Co.*, 314 F.2d 675, 679 (2d Cir. 1963) ("Other facts which have recurrently contributed to findings of bad faith on the part of the insurance company are [among other things] … attempts by the company to induce the assured to contribute to a settlement within the policy limits . . . ."); 1 Dennis J. Wall, Lititgation and Prevention of Insurer Bad Faith § 3.13 (3d ed. 2011) ("If a liability insurer insists that its insured contribute toward settling a claim for a sum with policy limits, it thereby commits bad faith and deals unfairly with its insured."); Robert E. Keeton & Alan I. Widiss, Insurance Law § 7.8(d) (Student ed. 1988) ("[A]n insurer may invite trouble if it suggests that its insured settle without making it clear that the company stands ready to contribute its entire policy limit. Were an insurer to suggest a settlement without a full commitment of its liability coverage, its action would probably support the inference that the company was preferring its own interests over those of the insured . . . ."). The court is not aware of any Pennsylvania court decision on this point. Based upon the above authority, however, the court predicts that the Supreme Court of Pennsylvania would find that, in an appropriate case, an insurer's insistence that an insured contribute to settlement within policy limits supports a contractual bad faith claim.

Viewing the facts in the light most favorable to McMahon, Carroll asked McMahon whether she had "considered contributing [her] own money to settle this"

and, at the end of the mediation, whether she was "going to do something now." (McMahon Dep. 9:6–12:3.) McMahon considered Carroll's questions to be a recommendation. (*Id.*) Carroll's alleged statements are fairly mild and do not evince any overt pressure or insistence. The record contains no evidence that Carroll made the alleged statements intending to benefit Medical Protective at the expense of McMahon or that he had of motive of self-interest or ill will. In terms of knowing what Medical Protective's internal settlement limit or negotiation strategy was, Carroll was in the same position as Decker and McMahon. Given the high evidentiary burden applicable to bad faith claims, the court concludes that McMahon's argument with respect to the invitation to contribute are insufficient to defeat Medical Protective's motion for summary judgment. No reasonable jury could determine that Carroll's alleged statements are clear and convincing evidence of contractual bad faith by Medical Protective.

At worst, Carroll's alleged statements constituted negligence, and Carroll's negligence cannot be imputed to Medical Protective.[11] In *Ingersoll-Rand Equipment Corp. v. Transportation Insurance Co.*, 963 F. Supp. 452 (M.D. Pa. 1997), the district court, as a matter of first impression, predicted that Pennsylvania courts would find an independent contractor relationship between insurers and defense counsel hired to represent insureds. *Id.* at 454. That case involved allegations of malpractice by the attorney defending the insured. The insured asserted a vicarious negligence claim against the insurer. The district court held that the attorney's ethical obligations to the insured "prevent the insurer from exercising the degree of control necessary to justify the imposition of vicarious liability." *Id.* "The lawyer's negligence therefore can not be imputed to the client." *Id.* at 455. The court noted that a claim might lie against the

---

11    McMahon did not assert any claim against Carroll, Pieseski, or Davies McFarland & Carroll in this lawsuit, and the court makes no findings with respect to this issue except for the determination that Medical Protective cannot be vicariously liable for any negligence by these attorneys.

insurer in situations where the insurer exercised "an abnormal degree of control over the litigation." *Id.* There is no evidence of any abnormal degree of control by Medical Protective in this case. The evidence shows that Medical Protective did not direct Carroll to suggest that McMahon make a personal contribution—Ball's uncontroverted testimony was that Medical Protective urged McMahon not to contribute.

The *Ingersoll-Rand* decision is persuasive.[12] The decision cited by McMahon, *CAMICO Mutual Insurance Co. v. Heffler, Radetich & Saitta, LLP,* Civil No. 11-4753, 2013 WL 315716 (E.D. Pa. Jan. 28, 2013), is distinguishable because it addressed whether an insurer and insured are co-clients for purposes of the attorney-client privilege, not whether the insurer can be vicariously liable for an attorney's conduct. McMahon argues that Medical Protective exercised "substantial control" over the litigation by virtue of its longstanding relationship with Davies McFarland & Carroll and because it received attorney suit reports directly from Pieseski and Carroll. (Pl.'s Surreply 2, ECF No. 74.) The relationship and receipt of reports do not establish "substantial control" over the attorneys who provided the reports. Medical Protective is entitled to summary judgment with respect to the alleged invitation of Carroll.

---

12  As noted in *Ingersoll-Rand*, 963 F. Supp. at 454, the law in other jurisdictions is mixed. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 628 (Tex. 1998) ("[T]he insurer cannot be vicariously responsible for the lawyer's conduct."); *Feliberty v. Damon*, 527 N.E.2d 261, 265 (N.Y. 1988) ("[G]iven the insurer's inability to provide or control the legal services in issue, and the existence of a remedy for incompetence against counsel, we concluded that the imposition of vicarious liability in the circumstances is unwarranted."); *Merritt v. Reserve Ins. Co.*, 110 Cal. Rptr. 511, 526–27 (Cal. Ct. App. 1973) ("An attorney may act as an employee for his employer in carrying out nonlegal functions; he may be the agent of his employer for business transactions, or for imputed knowledge; but in his role as trial counsel, he is an independent contractor." (citations omitted)). *But see, e.g., Boyd Bros. Transp. Co. v. Fireman's Fund Ins. Cos.*, 729 F.2d 1407, 1410 (11th Cir. 1984) (rejecting *Merritt* under Alabama law); *Smoot v. State Farm Mut. Auto. Ins. Co.*, 299 F.2d 525, 530 (5th Cir. 1962) ("Those whom the Insurer selects to execute its promises, whether attorneys, physicians, no less than company-employed adjusters, are its agents for whom it has the customary legal liability.").

## B. Statutory Bad Faith Claim

Pennsylvania's insurance bad faith statute provides statutory remedies for situations where an insurer acted in bad faith toward its insured. 42 Pa. Cons. Stat. § 8371 (permitting the court to award interest, punitive damages, and attorney's fees). To establish a bad faith claim under this statute, a plaintiff must prove, by clear and convincing evidence, "(1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). In evaluating motions for summary judgment, courts must consider the heightened evidentiary burden borne by the insured. *Id.* (noting that the insured's burden in opposing summary judgment is commensurate to the heightened substantive evidentiary burden at trial).

Liability for bad faith can be premised on more than just unreasonably denying benefits under the policy. *UPMC Health Sys.*, 391 F.3d at 506 ("While the alleged bad faith need not be limited to the literal act of denying a claim, the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits." (citation omitted)). "Bad faith conduct also includes 'lack of good faith investigation into fact[s], and failure to communicate with the claimant.'" *Brown*, 860 A.2d at 501 (discussing a first-party claim) (quoting *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994)). "In the third party context, 'bad faith' encompasses the manner by which an insurer discharges its obligations of defense and indemnification." *NIA Learning Ctr., Inc. v. Empire Fire & Marine Ins. Cos.*, Civil No. 05-5178, 2009 WL 3245424, at *9 (E.D. Pa. Oct. 1, 2009). "[I]n the absence of evidence of a dishonest purpose or ill-will, it is not bad faith [for the insurer] to take a stand with a reasonable basis or to 'aggressively investigate and protect its interests' in the normal course of litigation." *Brown*, 860 A.2d at 501 (quoting *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 910 (Pa. Super. Ct. 1999)).

In light of the court's conclusions with respect to Condition 2 of the policy, Medical Protective had a contractual basis for declining to reimburse McMahon for the $50,000 she contributed to the settlement. McMahon argues, however, that Medical Protective acted in bad faith not only by refusing to reimburse her for those funds, but also by its conduct during the settlement negotiations. Specifically, McMahon raises the same arguments she asserted with respect to the contractual bad faith claim, that is, Medical Protective acted in bad faith by not informing her about its internal settlement limits and by inviting her to contribute personally to the settlement.

With respect to McMahon's argument that Medical Protective invited her to contribute, having found that Medical Protective is entitled to summary judgment under the negligence standard applicable to contractual bad faith claims, the court will grant summary judgment in Medical Protective's favor with respect to that assertion of bad faith under the higher knowing or reckless standard applicable to the statutory bad faith claim.

With respect to the alleged misrepresentation about whether Medical Protective was willing to offer more to settle, it is even a closer call whether a reasonable jury could find that this rises to the level of recklessness. Ball knew McMahon was considering a personal contribution. Although he told Decker to stay the course and urged McMahon not to contribute, he nevertheless said that Medical Protective would not offer more than $1.3 million, even after the mediation. Ball never informed Marshall that Medical Protective's chief executive officer had authorized settlement up to the policy limit. Marshall was in the room when McMahon offered her own money, but he did not call Ball at that time to see whether Medical Protective would either pay the extra $50,000 or reassure McMahon that it would continue to negotiate and offer more money to settle later, if necessary. When Marshall later asked Ball whether Medical Protective would pay the extra $50,000, Ball did not authorize it. A reasonable jury might consider those actions and inactions to be at

least reckless on the part of Medical Protective.[13] Summary judgment in Medical Protective's favor is precluded by issues of fact that must be resolved by a jury.

## V.   Conclusion

For the reasons set forth above, McMahon's motion for summary judgment is denied. Medical Protective's motion for summary judgment is granted in part with respect to McMahon's claims based upon the applicability of Condition 2 and the statements made by Carroll. Medical Protective's motion is denied in all other respects. The only issues remaining for trial are whether Ball or Marshall made a misrepresentation or omitted to provide material information and whether that conduct or failure to act constitutes contractual or statutory bad faith. An appropriate order will be entered.

Dated: March 20, 2015                    /s/ Joy Flowers Conti
                                         Joy Flowers Conti
                                         Chief United States District Judge

---

13    The record does not contain sufficient evidence for a reasonable jury to find, by clear and convincing evidence, that Medical Protective was motivated by an improper purpose such as ill will or self-interest. The presence of an improper motive, however, is not an element of a statutory bad faith claim under Pennsylvania law. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997).